**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ERIC LANGMAN and CLAUDE LANGMAN, | |
| Plaintiffs, | |
| v. | Civil Action No. 2025-cv-6056 |
| P&G RARE VIOLINS, INC. as successor in interest to and d/b/a BEIN & FUSHI, INC., BEN-DASHAN INC., GABRIEL BEN-DASHAN, and PAIGE BEN-DASHAN, | Hon. _____ |
| | **Demand for Jury Trial** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Eric Langman and Claude Langman (collectively, "Plaintiffs" or the "Langman Family"), for their complaint against Defendants P&G Rare Violins, Inc. as successor in interest to and d/b/a Bein & Fushi, Inc., Ben-Dashan Inc., Gabriel Ben-Dashan, and Paige Ben-Dashan (collectively, "Defendants"), allege as follows:

### NATURE OF ACTION

1.      This action arises out of many years of deceit, self-dealing, and fraud by Defendants related to Defendants' role as an agent and trusted advisor to the Langman Family in connection with the family's investment in tens of millions of dollars of fine violins, violas, cellos, and bows, which has resulted in the payment to Defendants of millions of dollars while the Langman Family realized little or no profit from its investments.

2.      This action specifically involves Defendants' misconduct relating to and unlawful possession of the following instruments and bows (collectively, the "Instruments and Bows"),

which are owned in whole or part by the Langman Family and collectively valued in the range of $30 million:

      a. a violin by Giuseppe Guarneri del Gesù, circa 1740, which is commonly referred to as the "Russian" (the "Guarneri del Gesù Russian Violin");

      b. a violin by Nicolò Amati, circa 1651, which is commonly referred to as the "Antoncich" (the "Amati Antoncich Violin");

      c. a violin by Antonio Stradivari, circa 1728, which is commonly referred to the "Thunis" (the "Stradivari Thunis Violin");

      d. a violin by Giovanni Grancino, circa 1693 (the "Grancino Violin");

      e. a violin by Giuseppe Guadagnini, circa 1797 (the "Guadagnini Violin"); and

      f. violin bows by Leonard Tourte, Jean Grand Adam, and an unidentified maker (the "Three Bows").

3.    The Langman Family is the sole owner of all of the Instruments and Bows except the Stradivari Violin, in which the Langman Family has a majority ownership interest.

4.    Each of the Instruments and Bows has been unlawfully held and/or sold and/or otherwise disposed of by Defendants. There are no written agreements between any of Plaintiffs and any of Defendants regarding the terms of Defendants' possession, sale, or disposition of any of the Instruments and Bows.

5.    As detailed below, Defendants have breached their fiduciary duties to the Langman Family and engaged in fraud in myriad ways relating to the Instruments and Bows.

6.    As detailed below, the Langman Family has repeatedly asked Defendants to return the Instruments and Bows, and Defendants have refused to do so, despite having no right to retain possession of, sell, or dispose of the Instruments and Bows.

## PARTIES

7.     Plaintiffs are individuals and residents of Califon, New Jersey.

8.     Defendant P&G Rare Violins, Inc. ("P&G") is an Illinois corporation with its principal place of business at 410 South Michigan Avenue, Chicago, Illinois.  P&G does business as Bein & Fushi, Inc. ("BFI") and is a successor in interest to BFI.  BFI and P&G are collectively referred to in this complaint as "B&F."

9.     Defendant Ben-Dashan Inc. is an Illinois corporation with its principal place of business at 410 South Michigan Avenue, Chicago, Illinois.  Upon information and belief, Ben-Dashan, Inc. owns all or part of P&G and is owned by Gabriel Ben-Dashan and/or Paige Ben-Dashan.

10.     Defendant Gabriel Ben-Dashan is an individual and, upon information and belief, a resident of Illinois.  Gabriel Ben-Dashan is or was an employee of B&F, and, upon information and belief, directly or indirectly owns all or part of P&G and/or Ben-Dashan, Inc.

11.     Defendant Paige Ben-Dashan is an individual and, upon information and belief, a resident of Illinois.  Paige Ben-Dashan is or was an employee of B&F, and, upon information and belief, directly or indirectly owns all or part of P&G and/or Ben-Dashan, Inc.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this matter, pursuant to 28 U.S.C. §1332(a), as the action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

13.     This Court has personal jurisdiction over Defendants because they are residents of the State of Illinois.

3

14. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a), (b)(1), and (d) because all Defendants reside in this District and are residents of the State of Illinois. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

15. B&F sells, restores, and advises clients on fine stringed instruments and bows.

16. B&F was established in 1976 by the late Robert Bein and Geoffrey Fushi and describes itself as "the world's premier dealer and restorer of fine stringed instruments." *See* https://beinfushi.com/about/.

17. B&F regularly buys and sells antique stringed instruments made by some of the most sought-after craftsman in history, including instruments by Antonio Stradivari, Giuseppe Guarneri del Gesù, and Nicolò Amati. Such instruments typically sell for six to eight figure sums. *See* https://beinfushi.com/notable-sales/vn3929/.

18. In addition to selling and restoring fine stringed instruments, B&F also serves as an advisor to its clients. In its capacity as an advisor, B&F provides advice and guidance to its clients regarding opportunities to purchase and/or invest in various instruments.

19. Because most working musicians cannot afford the six- to eight-figure prices of many of the instruments sold by B&F, a large number of B&F's clients are investors in fine stringed instruments with whom B&F has an ongoing advisory relationship.

20. To appeal to these investor clients, B&F markets a program it refers to as "The Stradivari Society" in which a client can purchase from B&F fine stringed instruments as investments (through B&F and pursuant to B&F's investment advice), which B&F, on behalf of the client, then loans out to be played by promising musicians. The association of an instrument

4

with a musician is intended to increase the notoriety and reputation of the instrument and thus make the instrument more valuable for the investor. B&F earns substantial commissions from the sales of these investment instruments.

21. Malcolm Langman, who died in 2007, is the father of Plaintiffs Eric and Claude Langman.

22. Malcolm Langman was a successful businessman and an amateur violinist who used the proceeds from his successful business career to invest in and collect fine stringed instruments and bows, which he enjoyed playing until his death in 2007.

23. Because Malcolm Langman was not an expert on fine stringed instruments and bows, he engaged B&F, which has world-renowned expertise in fine stringed instruments and bows, starting in or around 1997 to act as an agent and trusted advisor in connection with his ongoing collection of fine stringed instruments and bows.

24. From 1997 until his death in 2007, B&F acted as an agent and trusted advisor in connection with Malcolm Langman's purchase and sale of tens of millions of dollars of instruments and bows.

25. During that time, Robert Bein, one of two owners of B&F, referred to Malcolm Langman as the "best customer" of B&F.

26. B&F's role as an agent and trusted advisor to Malcolm Langman included advising him on which instruments and bows to purchase, locating suitable instruments and bows for him to purchase, negotiating the terms of the purchases, locating potential purchasers for instruments and bows owned by him, and negotiating the terms of sale of those instruments and bows.

27. B&F's role also included guaranteeing the authenticity, appraised value, and condition of each of the stringed instruments and bows purchased and sold by Malcolm Langman.

28.     In connection with this role, B&F issued certificates of authenticity and appraisals for each of the stringed instruments and bows purchased and sold by Malcolm Langman.

29.     B&F also inspected the instruments and bows owned by Malcolm Langman on an ongoing basis and provided updated appraisals for investment and insurance purposes.

30.     When B&F sold an instrument or bow in Malcolm Langman's collection, B&F would often recommend that Malcolm Langman use the proceeds to purchase another instrument or bow that B&F, on his behalf, deemed to be a good acquisition for him.

31.     For example, in or around 2004-2005, Malcolm Langman, on the advice and counsel of B&F, traded in two violins by Antonio Stradivari that he had previously purchased on the advice of B&F for a more "sought after" violin by Antonio Stradivari that is commonly referred to as the "Rivaz" (hereinafter the "Rivaz Violin"). In total, the trade was valued at $5 million.

32.     In 2000, Malcolm Langman purchased from B&F the Guarneri del Gesù Russian Violin, which is commonly referred to as the "Russian" because it was unknown in modern times until after the fall of the Soviet Union. Today, professional appraisers estimate the value of the Guarneri del Russian Gesù Violin to be in the range of $18-$20 million.

33.     In July 2006, the Langman Family purchased the Amati Antoncich Violin—a violin by Nicolò Amati, circa 1651, commonly referred to as the "Antoncich"—from B&F for $950,000. At the time of purchase, Robert Bein promised the Langman Family that the violin was one of the finest and most pristine examples of a Nicolò Amati "grand pattern" violin in existence. The fact that the Amati Antoncich Violin had known provenance made it even more desirable and valuable. Today, the estimated value of the Amati Antoncich Violin is believed to be in the range of $2.5-$3.5 million.

34. Upon Malcolm Langman's death in 2007, Malcolm Langman's collection of instruments and bows became property of the Langman Family, and the Langman Family continued to work with B&F as the family's agent, trusted advisor, and fiduciary in connection with its ongoing investments in the purchase and sale of instruments and bows.

35. After Malcolm Langman's death, the primary purpose of the Langman Family's relationship with Defendants has been to invest in fine instruments and bows.

36. Since 2007, the Langman Family has purchased and sold millions of dollars of instruments and bows via B&F.

37. Throughout the course of the Langman Family's relationship with Defendants following Malcolm Langman's death, after the family would purchase an instrument via B&F, B&F, at Gabriel Ben-Dashan's solicitation and urging, would hold the instrument in its inventory and ultimately resell it. Often, following a resale of an instrument, rather than giving the Langman Family the proceeds from the resale, Defendants would instead advise the Langman Family to reinvest the family's proceeds from the resale into another instrument that the family would purchase, via B&F, and then have B&F hold, on the family's behalf, until it could make another resale. Upon information and belief, whenever Defendants advised the Langman Family to resell an instrument, Defendants had at least one other instrument "waiting in the wings" that they would advise the Langman Family to purchase with the proceeds from the resale. In such cases, Defendants would strongly recommend and urge the Langman Family to reinvest the proceeds of the sale into the instrument "waiting in the wings" and assure the Langman Family that the instrument to be purchased was a good investment at wholesale value, upon which a reasonable profit could be realized on resale.

38.     Defendant Gabriel Ben-Dashan, who had worked for B&F since the mid-1990s, eventually became the director of sales and the primary contact for the Langman Family (especially after the deaths of Robert Bein in 2007 and Geoffrey Fushi in 2012).  Defendant Paige Ben-Dashan also worked for B&F during this period and advised the Langman Family.

39.     As Gabriel and Paige Ben-Dashan became the primary B&F contacts for the Langman Family, Eric Langman told Gabriel that, as a condition to continuing to work with Defendants and using the Langman Family's money to fund Defendants' inventory, the Langman Family wanted to be informed and involved participants in its investments, including being involved with decisions regarding how the funds from sales of instruments would be re-invested and being made aware of discussions with possible purchasers of instruments and bows and the financial terms of those deals.  While he acknowledged that Defendants could make reasonable profits from their work with the family, Eric insisted that Defendants be transparent and fair regarding such profits.

40.     In response, Gabriel promised to be transparent and to keep the family informed and involved participants in its investments with B&F.

41.     Around the same time, Gabriel suggested that Eric could help him purchase BFI from the estate of its deceased founders, either as an investor or business partner, as Gabriel claimed that he did not have the money to purchase BFI himself.

42.      Once Gabriel and Paige became the primary B&F contacts for the Langman Family, Gabriel represented to Eric Langman that he had several promising buyers for the Rivaz Violin (which, as noted above, B&F had sold to the Langman Family via a $5 million trade around 2004-2005).

43.     Upon information and belief, prior to approaching the Langman Family or otherwise confirming that the Langman Family was willing to sell the Rivaz Violin, Gabriel tried to steer buyers interested in other violins toward the Rivaz Violin.

44.     The Langman Family, which was feeling financial pressure from the downturn in its investments in commercial real estate during the Great Recession, agreed to allow Defendants to take possession of the Rivaz Violin and sell it to buyers that Gabriel represented he had for the instrument.

45.     The Langman Family and Defendants entered into a written agreement that contained the terms of the consignment for the Rivaz Violin.  Pursuant to that agreement, the Langman Family would receive no less than $5.25 million for the Rivaz Violin, which could be paid in a lump sum or in installments.

46.     In May 2011, the Langman Family agreed to sell the Rivaz Violin through Defendants to a buyer Gabriel had secured for a net payment of $5.2 million, which represented only a small profit on the $5 million investment the Langman Family had made in the instrument six years earlier.  The payment was to be made in installments, with the final payment due to the Langman Family three years later in 2014.

47.     Defendants did not disclose to the Langman Family the amount that the buyer paid Defendants for the Rivaz Violin.

48.     While the Langman Family made only a small profit on the sale of the Rivaz Violin, Defendants, upon information and belief, made substantial commissions and/or profits on the sale.

49.     On June 19, 2011, Gabriel Ben-Dashan convinced Eric Langman to allow Defendants to take possession of the Guarneri del Gesù Russian Violin (which, as noted above,

Malcolm Langman had purchased from B&F in 2000) for purposes of "inspection" and for safekeeping in a safe deposit box at Harris Bank in Chicago.

50.     Eric instructed Gabriel that the Guarneri del Gesù Russian Violin was NOT to be offered for sale at that time but that Gabriel could show the violin on rare occasions to a select few people who, in Gabriel's opinion, could potentially be future buyers of the violin, in order to "groom" those potential future buyers should Eric one day decide to sell it.

51.     In or around December 2014, Gabriel recommended that the Langman Family purchase from B&F the Grancino Violin—a violin by Giovanni Grancino, circa 1693—which, pursuant to the parties' standard course of conduct, B&F would keep and hold in inventory and attempt to sell for a profit to be returned to the Langman Family.

52.     On December 27, 2014, the Langman Family purchased the Grancino Violin via Defendants for $535,000.

53.     Upon information and belief, Defendants made a commission on the Langman Family's purchase of the Grancino Violin.  This commission was not disclosed to the Langman Family.

54.     The Langman Family has never had possession of the Grancino Violin.

55.     Defendants never notified the Langman Family if the Grancino Violin was sold.

56.     Upon information and belief, Defendants still have possession of the Grancino Violin.

57.     In 2015, Eric gave Gabriel permission to tell the potential buyers Gabriel was supposed to have been "grooming" during the previous four years that that the Guarneri del Gesù Russian Violin may be available for purchase (but not to broadly market the violin for sale or to

sell it until Gabriel and Eric discussed and agreed on the terms of sale, including acceptable pricing and sales commission).

58.     Per Eric's urging, Eric drafted for Gabriel a generous proposal for remuneration for the Guarneri del Gesù Russian Violin and presented it to Gabriel in New York during a meeting in 2018, but Gabriel was reluctant to enter into a written agreement or to seriously discuss it. Instead, Gabriel agreed to present any offers that he received on the violin to Eric for review, discussion, and approval.  Defendants never had the right to sell the Guarneri del Gesù Russian Violin without Eric's express approval of the terms of sale.

59.     In 2016, Defendants sold a cello by Nicolò Amati (the "Amati Cello") that the Langman Family had owned for 10 years and represented that the family would be entitled to a net payment of $2.5 million from the sale.

60.     Upon information and belief, Defendants made substantial commissions and/or profits on the sale of the Amati Cello.  These commissions and/or profits were not disclosed to the Langman Family.

61.     Instead of paying the full proceeds to the Langman Family from the sale of the Amati Cello and the Rivaz Violin, Gabriel Ben-Dashan advised the Langman Family to reinvest a portion of those amounts—in total, approximately $5.6 million—into the Stradivari Thunis Violin, a violin by Antonio Stradivari, circa 1728, commonly referred as the "Thunis Strad."  Defendants represented that the Langman Family had the opportunity to purchase the Stradivari Thunis Violin at "wholesale" value, which the Langman Family interpreted as the value at which Defendants were acquiring the instrument.  Defendants did not disclose the price for which they purchased the Stradivari Thunis Violin or whether they would earn any compensation or commission on the Langman Family's purchase of the violin.

62. Gabriel recommended the Stradivari Thunis Violin as a good investment for the Langman Family because it was made in Antonio Stradivari's sought-after "Golden Period" and was in excellent and original condition. He also represented that Defendants would be able to sell the instrument quickly.

63. The Langman Family agreed to the investment because of Defendants' expertise and role as trusted advisor to the Langman Family in connection with such investments.

64. In total, the Langman Family invested approximately $5.6 million in the Stradivari Thunis Violin.

65. The Langman Family believed at that time that it was the sole investor in the Stradivari Thunis Violin. Defendants did not disclose that any shares in the violin were available or issued to others.

66. The Langman Family believed that the investment would be short term until Defendants found a buyer for the Stradivari Thunis Violin and made a "quick sale," from which the Langman Family would make a small profit.

67. Defendants did not provide the Langman Family with any written agreement or other disclosures relating to this investment.

68. Defendants did not provide any professional appraisal or condition report or certificate to the Langman Family about the Stradivari Thunis Violin (nor did Defendants provide such documents for any other instrument that Defendants persuaded the Langman Family to invest in during the period from 2011-2021).

69. Despite Defendants' representations otherwise, the Stradivari Thunis Violin did not sell quickly.

70.     The Langman Family later learned that its investment in the Stradivari Thunis Violin was not what had been promised or understood.  At that time, the family learned for the first time that at least two other investors owned "shares" in the Stradivari Thunis Violin and had invested at least an additional $1.3-$1.4 million in the instrument, which made the total (known) amount invested in the Stradivari Thunis Violin approximately $6.9-$7 million, with at least four parties holding "shares" in the violin.

71.     The Langman Family also later learned that the actual acquisition cost of the Stradivari Thunis Violin by Defendants was, upon information and belief, less than $5 million, despite the fact that the investors had contributed nearly $7 million ostensibly to acquire it (and that Defendants told the Langman Family it was paying "wholesale" value for it).

72.     Upon information and belief, Defendants took the difference of approximately $2 million for their own use without disclosing it to the Langman Family.

73.     The Langman Family was never told what percentage "share" it had in the Stradivari Thunis Violin, nor were any of the other terms or risks of the investment disclosed or documented by Defendants.

74.     Upon information and belief, Defendants never disclosed to the Illinois Secretary of State that it was offering shares of the Stradivari Thunis Violin to investors.

75.     In or around 2020, Gabriel Ben-Dashan told the Langman Family that he had found a potential buyer for the Stradivari Thunis Violin (which, as noted above, the Langman Family, as one of at least four investors, had invested $5.6 million in).

76.     While the proposed sale offered little profit to the Langman Family (due to the increased basis cost), the Langman Family agreed to it as a way to get out of a bad investment, especially in light of the COVID-19 pandemic sweeping the world at the time.

77.     Defendants never disclosed any profit that they would have received from the proposed sale.  Upon information and belief, the proposed sale would have provided more profit to Defendants than it would have provided to the Langman Family, even though the Langman Family was by far the largest investor in the instrument.

78.     The proposed sale was to a Russian performing artist based in Europe and was to be financed by a Russian bank owned by a wealthy Russian oligarch.

79.     Defendants gave possession to the performing artist during or around the summer of 2020.

80.     Despite multiple promises from Defendants, the Langman Family did not receive any payment from Defendants' sale of the Stradivari Thunis Violin, even though Defendants had already given possession of the violin to the performing artist.

81.     Upon information and belief, the bank in Russia never paid Defendants for the violin, despite the fact that Defendants gave possession of the instrument to the performing artist.

82.     Defendants did not disclose to the Langman Family that they planned to give possession of the violin to the performing artist prior to receiving payment for it.

83.     Around a year later, the current conflict in Ukraine began and many countries enacted sanctions against Russia, which created an untenable risk that the bank in Russia would never pay for the violin.

84.     Eventually, Eric Langman demanded that Gabriel extract the violin from the performing artist back to the United States and, after months of panic on Eric's part, one of Gabriel's associates in Europe was finally able to physically repossess the violin.

85.     After this incident, the Langman Family began to lose faith in Defendants' ability and judgment and demanded that Defendants maintain possession of the Stradivari Thunis Violin

14

and any other instruments owned by the Langman Family unless the Langman Family gave permission in advance for them to go into a third party's possession.

86.     Gabriel agreed to the Langman Family's demand.

87.     In 2021, after years of trying to purchase B&F, Gabriel and Paige Ben-Dashan finally purchased the business from the Fushi family and became the sole owners of the business. Upon information and belief, Gabriel and Paige are the owners of Defendant Ben-Dashan Inc., which in turn owns Defendant P&G, which continues to do business under the name "Bein & Fushi, Inc." and is a successor in interest to BFI. Gabriel currently serves as Owner and Executive Director of B&F.

88.     Gabriel's previous discussions with Eric Langman about Eric's becoming an investor or business partner in B&F did not come to fruition. However, upon information and belief, Defendants used some of their wrongfully acquired funds from their misconduct relating to the Langman Family's investments to purchase BFI, and Defendants continue to hold inventory that is the property of the Langman Family.

89.     After the sale of BFI, the Langman Family continued to use Defendants as its trusted advisors and fiduciaries in connection with its investments in the purchase and sale of instruments and bows.

90.     In April 2021, Gabriel told Eric that he had the opportunity to sell a violin by Francesco Gobetti that was owned by the Langman Family (the "Gobetti Violin") for the family's choice of: (1) a net payment to the Langman Family of $700,000; or (2) a net payment to the Langman Family of $500,000 plus ownership of the Guadagnini Violin—a violin by Giuseppe Guadagnini, circa 1797, valued by Gabriel to be worth $225,000—which would net the Langman Family a total value of $725,000.

91.     The Langman Family had purchased the Gobetti Violin for $650,000 in December 2014 based on Gabriel's recommendation that it was a good investment that would net a 5% annual return with a minimum of 20% overall profit.  The proposed payments for the sale of the Gobetti Violin did not meet those minimum returns.

92.     In or around April 2021, the Langman Family sold the Gobetti Violin in exchange for a net payment of $500,000 plus ownership of the Guadagnini Violin.  The transaction was invoiced via Ben-Dashan Inc. at Gabriel's home address, despite purportedly being via B&F.

93.     Upon information and belief, Defendants made more commissions and/or profits on the sale of the Gobetti Violin than the Langman Family made in profits.

94.     Gabriel represented to the Langman Family that the Guadagnini Violin would be a good investment if the family chose to accept it as part of the sale of the Gobetti Violin.  On the basis of Gabriel's recommendation, the Langman Family agreed to accept the Guadagnini Violin and became the owners of the Guadagnini Violin.

95.      The Langman Family later learned that the Guadagnini Violin was not a standard size violin but instead was a smaller 7/8 size violin, which renders it difficult or impossible to sell. Defendants did not disclose this fact to the Langman Family when recommending that the family acquire the Guadagnini Violin.

96.     The Langman Family never took possession of the Guadagnini Violin.

97.     The Guadagnini Violin continues to be in the possession of Defendants.

98.     In 2022, Eric wrote to Gabriel again asking that Gabriel return the Guarneri del Gesù Russian Violin to him.  Gabriel refused to return it, insisting that he knew what he was doing and that he was close to presenting terms for a sale.

99.     In the summer of 2023, Gabriel wrote to Eric that Defendants expected to have both the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin sold by the end of that year.

100.     Neither the Guarneri del Gesù Russian Violin nor the Stradivari Thunis Violin was sold in 2023.

101.     In 2023, Defendant Paige Ben-Dashan began asking Eric to allow Defendants to borrow the Amati Antoncich Violin (which, as noted above, the Langman Family purchased from B&F in 2006).

102.     In the winter of 2023-2024, Gabriel told Eric that Defendants had found another possible buyer for the Stradivari Thunis Violin (which, as noted above, the Langman Family, as one of at least four investors, had invested $5.6 million in), this time an aspiring young violinist who, according to Gabriel, offered $7.5 million for the violin.

103.     However, because of the inflated cost basis of the instrument that resulted from multiple undisclosed investors and the fraudulently inflated acquisition price of the instrument, this sale price would result in a net loss to the Langman Family and thus fell apart.

104.     Plaintiffs have since discovered via social media that, instead of trying to sell the Stradivari Thunis Violin, Defendants loaned it out to a young violinist for a period of time (and allowed it to leave Defendants' possession) without asking for or obtaining the consent of the Langman Family.

105.     In early February 2024, Gabriel asked Eric which bows the Langman Family owned and which, if any, it might be interested in selling.  Soon after, Eric brought five bows to B&F in Chicago for Gabriel to examine.  Of the five bows, Gabriel proposed, and Eric accepted, a very modest offer for two of them.  Gabriel asked if Defendants could keep the remaining three bows at their shop for identification and authentication: a bow by François Tourte (the "Tourte Bow"),

a bow by Jean Grand Adam, and a bow from an unidentified maker (which the Langman Family asked Defendants to identify) (these bows are collectively referred to as the "Three Violin Bows").

106. With respect to the Tourte Bow, Garbiel told Eric that he needed to subject the bow to further evaluation because he could not accurately evaluate it, other than being sure it was a bow by François Tourte, one of the most renowned bow makers from nineteenth-century France, and had a value in the six-figure range. While Gabriel normally proclaimed himself a "knowledgeable bow expert," and even though Malcolm Langman had purchased this bow from B&F several years earlier, Gabriel nevertheless stated that he needed to get a second opinion about the Tourte Bow from another expert before he could place an exact value on it.

107. Defendants continue to hold the Three Violin Bows in their possession.

108. During Eric's visit to Defendants' shop in Chicago in February 2024, he also asked to see the Guarneri del Gesù Russian Violin, which, per the Langman Family's prior instruction, was not to leave Defendants' shop without the family's permission.

109. Gabriel refused to show the Guarneri del Gesù Russian Violin to Eric.

110. Also in February 2024, Paige Ben-Dashan, who was visiting New York City, asked Eric to meet her there and to allow her to borrow the Amati Antoncich Violin and bring it back to Chicago with her. Eric asked her why Defendants wanted to borrow the Amati Antoncich Violin so badly.

111. Paige told Eric that she wanted to bring the Amati Antoncich Violin back to Chicago so that Defendants' new professional photographer could take some detailed photos of the instrument and so that Defendants could "update [their] files" and do an "inspection and evaluation" of the violin.

112.    Eric, in reliance on this representation by Paige, reluctantly agreed to allow Defendants to take possession of the Amati Antoncich Violin on the condition that Defendants NOT sell the violin and instead return it to him in three to four months.

113.    There was no written agreement between any Plaintiffs and any Defendants relating to the Amati Antoncich Violin.

114.    In early April 2024, Paige and Gabriel Ben-Dashan called Eric and told him that they had a buyer for the Amati Antoncich Violin with a proposed sale price in the range of $1.5 million, despite the fact that Eric had not given them permission to sell it.

115.    Eric responded that, even if he were to consider selling the Amati Antoncich Violin, he believed the value to be at least around $2.2-$2.5 million based on an opinion he had received from a prominent violin dealer and appraiser in London, England, three years earlier.

116.    Gabriel responded that he was "the expert" and that no violin by Nicolò Amati could ever sell for more than $2 million, even those that are more pristine than the Amati Antoncich Violin.  This assertion was in stark contrast to the statement by Robert Bein when the Langman Family purchased the Amati Antoncich Violin that it was one of the finest violins in existence by Nicolò Amati.

117.    Eric told Gabriel that the Langman Family was in urgent need of cash for extensive repairs that were needed to the family's home and said that if the family were to even consider selling the Amati Violin, the violin would need to be sold for $1.8 million if paid immediately in one payment, or $1.9 million if paid by installments over no longer than nine months.  He did not authorize Defendants to sell the violin during that conversation or at any other point.

118.    In May 2024, a violin dealer in London, who was aware that the Langman Family owned the Guarneri del Gesù Russian Violin, contacted Eric and said that he had a client interested

in buying a fine violin by Guarneri del Gesù. Eric informed Gabriel about the potential customer and asked Gabriel to reach out to the dealer in London. Eric specifically asked Gabriel to cooperate with the dealer in London and make a good-faith effort to see if there was a deal to be had. Eric suggested a few ways that Gabriel could approach communicating with the London dealer, but Gabriel dismissed all of Eric's suggestions out of hand and said that he "know[s] how to do [his] job." Gabriel told Eric over the course of the next few months that he had reached out to the London dealer but never heard back from the dealer. However, when Eric contacted the London dealer in April 2025—nearly one year later—and inquired as to what conversation he had with Gabriel the prior year, the London dealer told Eric that Gabriel had never contacted him about any Guarneri del Gesù violin.

119.    In June 2024, Eric asked Defendants to return the Amati Antoncich Violin (which, as noted above, Defendants had been holding since February 2024).

120.    In response, Defendants represented that they had sold the Amati Antoncich Violin, and, although Defendants did not disclose the terms of the purported sale, they indicated that payment in full would be immediately forthcoming.

121.    However, within a few weeks, Defendants began to tell different stories about the purported sale of the Amati Antoncich Violin—including stating first that the buyer needed to somehow extract money from Asia to pay for it, then that the buyer was sick, and later that the buyer's brother had unexpectedly died—before Defendants stopped responding to further inquiries from the Langman Family about the purported sale.

122.    Upon information and belief, Defendants traded the Amati Antoncich Violin to a musician who was based in London and North Carolina in exchange for a more valuable violin by Antonio Stradivari for which no cash was paid or payable from the buyer. Upon information and

belief, in in addition to trading the Amati Antoncich Violin, Defendants had to also pay an amount in cash for the violin by Antonio Stradivari.

123.     Upon information and belief, Defendants' valuation at sale of the Amati Antoncich Violin was approximately $3.5 million, even though Gabriel told Eric 30-60 days prior to the sale that the violin would never be worth more than $2 million.

124.     There was never any agreement, written or otherwise, for Defendants to sell the Amati Antoncich Violin.

125.     Defendants never received payment for the value of the Amati Violin.

126.     During this period, the tenor of Gabriel's communications with Eric changed sharply from cordial to contentious and adversarial.  Gabriel remarked on several occasions that Eric's father, Malcolm, had paid some invoices late, and used that as a justification as to why Eric should not complain that Defendants had failed to pay the Langman Family in a timely manner at various points.

127.     On several occasions during 2023-2024, Gabriel represented to Eric over the phone that he regarded himself as a conservator who was preventing the Langman Family from "squandering its investments," and, as a result, that payments to the Langman Family in connection with the family's investments should be spread out or delayed.

128.     During one phone call in early August 2024, Eric asked Gabriel for information on the status of the Guarneri del Gesù Russian Violin and told him that the other members of his family were getting nervous and exasperated by the extraordinary amount of time it was taking for Defendants to find a buyer for it and, because of this, wanted to take possession of it and the family's other instruments being held by Defendants.  Eric emphasized that Defendants could not expect to retain possession of the Guarneri del Gesù Russian Violin forever if they could not find

a buyer in short order.  In response, Gabriel exploded with expletives and anger at Eric.  He also informed Eric that the Langman Family should not expect to receive for the Guarneri del Gesù Russian Violin the amount that Gabriel had estimated (or anything more) when Defendants first convinced the Langman Family to allow B&F to take possession of it years earlier.

129.    From 2023-2024, Eric requested at least three times—including once during his meeting with Paige in New York City in February 2024—that Defendants provide the Langman Family with an official professional appraisal of the Guarneri del Gesù Russian Violin, telling Defendants that the family required this appraisal from an insurance company from which it was trying to obtain a policy.  However, each time Eric requested the appraisal, his request was either denied or simply ignored by Defendants.

130.    Despite the fact that Eric requested weekly updates from Gabriel in at various points in 2024, aside from the aforementioned telephone call in early August 2024, Gabriel never once called Eric, nor has he since provided him with any updates on the status of the Guarneri del Gesù Russian Violin or any of the Instruments or Bows.

131.    In November 2024, Eric intended to send a formal letter to Gabriel demanding that the Guarneri del Gesù Russian Violin be returned to him, but he decided to hold off after learning that Gabriel's mother had passed away over the Thanksgiving weekend.  Instead, in a last-ditch and good-faith effort to preserve a civil relationship with Gabriel and Paige Ben-Dashan, Eric made a five-hour drive to Washington, D.C., on December 20, 2004, to show support and to pay his respects to the Ben-Dashan family at the memorial service for Gabriel's mother.  Gabriel thanked him for coming and promised that he would be in touch soon "because there is business to discuss."

132.    Eric waited to hear from Gabriel but, despite his promise, Gabriel did not contact Eric.

133.    On March 25, 2025, after years of Defendants' non-responsiveness and failure to sell the Instruments and Bows pursuant to the Langman Family's wishes, Eric sent a formal letter to Gabriel notifying him to cease all sales efforts and to return the Instruments and Bows.

134.    Gabriel again refused to return the Instruments and Bows despite having no right to retain possession of them.

135.    Since March 25, 2025, Gabriel has continued to market and show the Instruments and Bows despite being instructed to cease doing so and having no right to sell them.

136.    For example, on May 21, 2025, Eric was informed by an industry source that Gabriel was showing the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin to potential buyers in Europe, despite that fact that: (1) the Langman Family had instructed him two months earlier to cease all sales efforts relating to those violins; (2) the Langman Family had demanded two months earlier that Gabriel return possession of those violins to the Langman Family; and (3) the Langman Family had instructed Gabriel that those violins were not to be taken out of Defendants' shop in Chicago without prior permission from the Langman Family.

137.    That same day, counsel for the Langman Family called Defendants' office and sent an e-mail to Defendants notifying Defendants' that they are not authorized to market or show the violins or to take them out of their shop in Chicago and demanding that the violins be returned to Chicago to be picked up by the Langman Family.

138.    On May 27, 2025, counsel for Plaintiffs sent an email to Defendants' counsel demanding the return of the Instruments and Bows by May 30, 2025.

139.     As of the date of this Complaint, the Instruments and Bows have not been returned to the Langman Family.

## COUNT I
### Replevin

140.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

141.     Plaintiffs are the owners of the Guarneri del Gesù Russian Violin, the Amati Antoncich Violin, the Grancino Violin, the Guadagnini Violin, and the Three Violin Bows.

142.     Defendants do not own the Guarneri del Gesù Russian Violin, the Amati Antoncich Violin, the Grancino Violin, the Guadagnini Violin, or the Three Violin Bows.

143.     Plaintiffs are not currently in possession of any of these instruments or bows.

144.     Defendants are in possession of all of these instruments and bows.

145.     Defendants wrongfully detained all of these instruments and bows.

146.     Plaintiffs have demanded that Defendants return all of these instruments and bows to them.

147.     Defendants have refused to return any of the instruments or bows to Plaintiffs, despite Plaintiffs' **multiple** demands for their return.

148.     None of these instruments or bows has been taken for any tax, assessment, or fine levied by virtue of any Illinois law.

149.     None of these instruments or bows has been seized under any lawful process.

150.     None of these instruments or bows has been held by virtue of any order for replevin against Plaintiffs.

151.     Plaintiffs have been damaged by Defendants' continued wrongful possession of the Guarneri del Gesù Russian Violin, the Amati Antoncich Violin, the Grancino Violin, the Guadagnini Violin, and the Three Violin Bows.

152.     Plaintiffs continue to suffer ongoing damage as a result of Defendants' continued wrongful possession of these instruments and bows.

## COUNT II
## Conversion

153.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

154.     Plaintiffs are the owners of the Guarneri del Gesù Russian Violin, the Amati Antoncich Violin, the Grancino Violin, the Guadagnini Violin, and the Three Violin Bows.

155.     Plaintiffs have a possessory right in these instruments and bows.

156.     There are no restrictions or conditions limiting Plaintiffs' possessory rights in these instruments and bows.

157.     Defendants have wrongfully and without authorization assumed control, dominion, and/or ownership over these instruments and bows.

158.     Plaintiffs have demanded that Defendants return these instruments and bows.

159.     Defendants have refused to return these instruments and bows to Plaintiffs despite Plaintiffs' demands.

160.     Plaintiffs have been damaged by Defendants' continued wrongful possession of the Guarneri del Gesù Russian Violin, the Amati Antoncich Violin, the Grancino Violin, the Guadagnini Violin, and the Three Violin Bows.

161.     Plaintiffs continue to suffer ongoing damage as a result of Defendants' continued wrongful possession of these instruments and bows.

## COUNT III
## Breach of Fiduciary Duty

162.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

163. As Plaintiffs' agent and trusted advisor, Defendants have a special relationship with Plaintiffs such that Defendants owe Plaintiffs fiduciary duties with respect to the items described in this Complaint.

164. As Plaintiffs' fiduciary, Defendants had a duty to treat Plaintiffs with the utmost candor, good faith, loyalty, and care.

165. Defendants breached their fiduciary duty of candor to the Langman Family by failing to disclose information to the Langman Family that is material to the family's decision making, including, but not limited to:

    a. Failing to disclose the prices at which the instruments owned by the Langman Family were purchased or sold;

    b. Failing to disclose the compensation and commissions that Defendants received through the purchase and sale of instruments on behalf of the Langman Family;

    c. Failing to disclose the actual acquisition cost of the Stradivari Thunis Violin;

    d. Failing to disclose any compensation or commission earned by Defendants in connection with the acquisition of the Stradivari Thunis Violin;

    e. Failing to disclose (at the time of investment) that there were other investors in the Stradivari Thunis Violin in addition to the Langman Family;

    f. Failing to disclose the percentage "share" of the Stradivari Thunis Violin that was owned by the Langman Family;

    g. Failing to disclose that Defendants had sold the Amati Antoncich Violin;

    h. Failing to disclose the price for which Defendants sold the Amati Antoncich Violin;

    i. Failing to disclose the compensation and commission earned by Defendants from the sale of the Amati Antoncich Violin;

j.   Failing to disclose that the Guadagnini Violin was not full sized and thus not marketable when advising the Langman Family to acquire it as an investment;

k.   Failing to disclose that the Stradivari Thunis Violin had been taken out of Defendants' shop and loaned to a musician despite the Langman Family's instruction that the violin was not to leave Defendants' shop without authorization from the Langman Family; and

l.   Failing to disclose that the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin were taken out of Defendants' shop and shown in Europe, despite the Langman Family's instruction that the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin were not to leave Defendants' shop without authorization from the Langman Family.

166.   Defendants breached their fiduciary duty of good faith to the Langman Family by failing to act honestly and fairly with the Langman Family, including, but not limited to:

a.   Failing to disclose the prices at which the instruments owned by the Langman Family were purchased or sold;

b.   Failing to disclose the compensation and commissions that Defendants received through the purchase and sale of instruments on behalf of the Langman Family;

c.   Failing to disclose the actual acquisition cost of the Stradivari Thunis Violin;

d.   Failing to disclose any compensation or commission earned by Defendants in connection with the acquisition of the Stradivari Thunis Violin;

e.   Failing to disclose that there were other investors in the Stradivari Thunis Violin in addition to the Langman Family;

    f.   Failing to disclose the percentage "share" of the Stradivari Thunis Violin that was owned by the Langman Family;

    g.   Misrepresenting the value of the Amati Antoncich Violin;

    h.   Failing to disclose that Defendants had sold the Amati Antoncich Violin;

    i.   Failing to disclose the price for which Defendants sold the Amati Antoncich Violin;

    j.   Failing to disclose the compensation and commission earned by Defendants from the sale of the Amati Antoncich Violin;

    k.   Failing to disclose that the Guadagnini Violin was not full sized and thus not marketable;

    l.   Taking possession of violins for inspection and then offering them for sale to third parties without authorization to do so; and

    m.   Failing to keep the Langman Family apprised as to the status and location of instruments and bows that the family owns.

167.   Defendants breached their fiduciary duty of loyalty to the Langman Family by acting in their own self-interest instead of acting in the best interests of the Langman Family, including, but not limited to:

    a.   Investing the Langman Family's money to create substantial profits for Defendants while returning only small profits to the Langman Family;

    b.   Taking undisclosed commissions on the purchase and sale of instruments owned by the Langman Family;

    c.   Undervaluing instruments owned by the Langman Family to induce the family to sell them for a lower price;

    d.   Overvaluing instruments purchased by the Langman Family to induce the family to purchase them for a higher price; and

    e.   Offering instruments and bows owned by the Langman Family for sale when the family had not authorized them to be sold.

168.    Defendants breached their fiduciary duty of care to the Langman Family by failing to exercise appropriate care over instruments owned by the Langman Family, including, but not limited to:

    a.   Allowing the Stradivari Thunis Violin to be acquired by a performing artist in Europe without securing payment;

    b.   Failing to retain secure possession of instruments and bows owned by the Langman Family;

    c.   Failing to have written agreements in place with sufficient protections for the Langman Family in connection with the purchase and sale of instruments and bows; and

    d.   Failing to have written agreements in place with sufficient protections for the Langman Family in connection with Defendants' possession and marketing of instruments and bows owned by the Langman Family.

169.    Defendants breached their fiduciary duty of obedience to the Langman Family by failing to follow the Langman Family's instructions, including, but not limited to:

    a.   Failing to keep the Langman Family informed and updated after being told to do so;

    b.   Offering instruments and bows owned by the Langman Family for sale when the family had not authorized them to be sold;

c. Selling the Amati Antoncich Violin without the right to do so;

d. Refusing to return the Instruments and Bows to the Langman Family upon the family's request;

e. Refusing to update appraisals as requested by the Langman Family;

f. Allowing the Stradivari Thunis Violin to be taken out of Defendants' shop and loaned to a musician despite the Langman Family's instruction that the Stradivari Thunis Violin was not to leave Defendants' shop without authorization from the Langman Family;

g. Failing to disclose that the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin were taken out of Defendants' shop and shown in Europe, despite the Langman Family's instruction that the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin were not to leave Defendants' shop without authorization from the Langman Family; and

h. Continuing to show the Guarneri del Gesù Russian Violin and the Stradivari Thunis Violin to potential buyers after being instructed by the Langman Family to cease all sales efforts relating to those violins.

170. Defendants' conduct has caused damage to Plaintiffs.

171. Plaintiffs continue to suffer ongoing damage as a result of Defendants' breach of their fiduciary duties.

## COUNT IV
### Fraud

172. Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

173.     As alleged above, Defendants made numerous false representations of fact to Plaintiffs and intentionally failed to disclose material facts to Plaintiffs that they had a duty to disclose, including but not limited to:

a.   In 2015 when Gabriel Ben-Dashan falsely represented to Eric Langman that the Stradivari Thunis Violin would be purchased for investment purposes at wholesale value;

b.   In 2015 when Gabriel Ben-Dashan failed to disclose the actual acquisition cost of the Stradivari Thunis Violin to the Langman Family;

c.   In 2015 when Gabriel Ben-Dashan failed to disclose the commissions that Defendants were receiving as a result of the Langman Family's investment in the Stradivari Thunis Violin;

d.   In 2015 when Gabriel Ben-Dashan failed to disclose to the Langman Family that there would be other investors in Stradivari Thunis Violin in addition to the Langman Family;

e.   In 2015 when Gabriel Ben-Dashan failed to disclose to the Langman Family the percentage "share" that the family had purchased in the Stradivari Thunis Violin;

f.   In February 2024 when Paige Ben-Dashan falsely represented to Eric Langman during a lunch in New York City that if the Langman Family brought the Amati Antoncich Violin from New York City to Defendants' facilities in Chicago, Defendants would only take detailed photographs of the instrument, "update [their] files," and do an "inspection and evaluation" of the violin;

g.  In April 2024 when Gabriel Ben-Dashan falsely represented to Eric Langman that no violin by Nicolò Amati could ever sell for more than $2 million while secretly marketing the Amati Antoncich Violin for a significantly higher price;

h.  In June 2024 when Defendants failed to disclose that they had sold the Amati Antoncich Violin following Eric Langman's request that Defendants return the violin to the Langman Family; and

i.   In June 2024 when Defendants failed to disclose that the sale price of the Amati Antoncich Violin was significantly higher than the $2 million top sale price that Gabriel Ben-Dashan had misrepresented to Plaintiffs 60-90 days before the sale.

174.    At the time Defendants made the above-mentioned representations to Plaintiffs, Defendants were aware that the representations were false.

175.    Defendants had a duty to disclose the above-mentioned undisclosed material facts to Plaintiffs.

176.    Defendants made these false representations and intentionally failed to disclose these material facts to induce Plaintiffs to invest in, provide Defendants with, and/or allow Defendants to sell the Instruments and Bows.

177.    Plaintiffs reasonably relied on these representations and omissions by Defendants.

178.    Plaintiffs were damaged as a result of their reliance on these representations and omissions by Defendants.

179.    Plaintiffs continue to suffer ongoing damage as a result of Defendants' fraud.

### COUNT V

**Consumer Fraud under Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.**

180.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

181.    As detailed above, Defendants made numerous false and deceptive representations to Plaintiffs and made numerous omissions of material facts.

182.    At the time Defendants made these representations and omissions to Plaintiffs, Defendants were aware that the representations were false and deceptive and that they were failing to disclose material facts.

183.    Defendants made these false and deceptive representations and omissions of fact to induce Plaintiffs to invest in, provide Defendants with, and/or allow Defendants to sell the Instruments and Bows.

184.    Plaintiffs relied on these deceptive misrepresentations and omissions by Defendants.

185.    These deceptions occurred in the course of conduct involving commerce.

186.    Plaintiffs have been damaged by Defendants' deceptions.

187.    Plaintiffs continue to suffer ongoing damage as a result of Defendants' fraud.

## COUNT VI
## Unjust Enrichment

188.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

189.    Defendants' willful and fraudulent conduct has resulted in Defendants' obtaining money and valuable instruments and bows that belong to Plaintiffs.

190.    Defendants accepted and retained money and valuable instruments and bows that belong to Plaintiffs without compensating Plaintiffs.

191.    Allowing Defendants to retain the money and valuable instruments and bows that belong to Plaintiffs without compensating Plaintiffs would result in an inequity for Plaintiffs.

192.    Plaintiffs have been damaged as a result of Defendants' unjust enrichment.

193.     Plaintiffs continue to suffer ongoing damage as a result of Defendants' unjust enrichment.

## COUNT VII

### Violation of Illinois Securities Law of 1953, 815 ILCS 5/12(G)

194.     Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

195.     Plaintiffs' interest in the Stradivari Thunis Violin constitutes a security.

196.     Defendants made misstatements and/or omissions in order to induce Plaintiffs to purchase shares of the Stradivari Thunis Violin, including but not limited to:

    a.   Falsely representing that if the Langman Family were to invest in the Stradivari Thunis Violin, the family would do so at wholesale value;

    b.   Failing to disclose the fact that the Langman Family would not be the sole investors in the violin;

    c.   Failing to disclose the percentage "share" of the Stradivari Thunis Violin that was owned by the Langman Family;

    d.   Failing to disclose the actual acquisition cost of the Stradivari Thunis Violin; and

    e.   Failing to disclose any compensation or commission earned by Defendants in connection with the acquisition of the Stradivari Thunis Violin.

197.     These misstatements and omissions were of material facts.

198.     These misstatements and omissions were made by Defendants in connection with the sale of securities to Plaintiffs.

199.     Plaintiffs relied on these misrepresentations and omissions in purchasing shares in the Stradivari Thunis Violin.

200.    Plaintiffs were damaged by their reliance on Defendants' misrepresentations and omissions.

201.    Plaintiffs continue to suffer ongoing damage as a result of Defendants' misstatements and omissions.

## COUNT VIII

### Successor Liability as to P&G Rare Violins, Inc.

202.    Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

203.    P&G is an Illinois corporation.

204.    Gabriel Ben-Dashan was an owner, controlling manager, and/or principal decision maker of BFI prior to P&G's purchase of BFI in 2021. Gabriel Ben-Dashan was president of P&G since its formation and is the "Owner and Executive Director" of B&F. Moreover, P&G operates under the same trade name, at the same address, and with the same inventory, equipment, telephone number, and website as BFI.

205.    Paige Ben-Dashan helped run the BFI office prior to P&G's purchase of BFI in 2021 and is currently an executive director of P&G.

206.    P&G is registered to do business with the State of Illinois as "Bein & Fushi, Inc."

207.    B&F's website contains no detectable change between before and after P&G purchased BFI and still has a prominently displayed logo that says "Bein & Fushi, Inc." P&G has stepped into the shoes and adopted the history of BFI in every aspect and is a mere continuation of BFI.

208.    In the alternative, P&G expressly or impliedly assumed the obligations and liabilities of BFI.

209.    Because P&G does business at the same address, with the same telephone number, and with the same website, it can be inferred that P&G assumed some or all of BFI's lease

obligations, BFI's telephone service obligations, and/or BFI's website hosting and maintenance obligations. Furthermore, upon information and belief, P&G honored BFI's prior agreements, including sales agreements.

210. By stepping into the shoes of BFI and adopted the entirety of its history, P&G has impliedly assumed the liabilities of BFI.

211. In the alternative, P&G and BFI merged based on the foregoing circumstances.

212. Because P&G either expressly or impliedly assumed the liabilities of BFI, or merged with BFI, P&G is liable for the conduct of B&F complained of herein.

**COUNT IX**

**Alter Ego / Piercing the Corporate Veil Against Ben-Dashan, Inc. and P&G Rare Violins, Inc.**

213. Plaintiffs repeat and reallege the preceding paragraphs as if set forth herein.

214. Upon information and belief, Gabriel Ben-Dashan and Paige Ben-Dashan dominated and controlled Ben-Dashan, Inc. and P&G to such an extent that there is no meaningful separation between the individuals and these corporate entities.

215. Gabriel Ben-Dashan and Paige Ben-Dashan exercise substantial control over both Ben-Dashan, Inc. and P&G and serve as their principal owners and decision-makers.

216. Upon information and belief, Ben-Dashan, Inc. and P&G have commingled assets, failed to observe corporate formalities, and have operated as a single business entity for the benefit of Gabriel Ben-Dashan and Paige Ben-Dashan.

217. Upon information and belief, the corporate structures of Ben-Dashan, Inc. and P&G were used as a façade to perpetrate fraud upon Plaintiffs while shielding Defendants from liability.

218.     Equity requires piercing the corporate veil of Ben-Dashan, Inc. and P&G to hold Gabriel Ben-Dashan, Paige Ben-Dashan, and these entities jointly and severally liable for the wrongful conduct described herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A.     Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

B.     An immediate Writ of Replevin compelling Defendants to return to Plaintiffs possession of the Guarneri del Gesù Russian Violin, the Amati Antoncich Violin, the Grancino Violin, the Guadagnini Violin, and the Three Violin Bows;

C.     The immediate appointment of a receiver to take possession of and oversee the sale of the Stradivari Thunis Violin;

D.     Damages in an amount to be proven at trial;

E.     Punitive and exemplary damages;

F.     All amounts unjustly obtained by Defendants;

G.     The appointment of a receiver over the assets and business of Defendants to provide an accounting and prevent potential harm to or liquidation of those assets;

H.     A constructive trust over all proceeds and assets acquired as a result of the Defendants' conduct alleged herein;

I.     Attorneys' fees and costs pursuant to 815 ILCS 505/10a(c) and other applicable law; and

J.     Such other and further relief as this Court deems just and equitable.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.


Dated:  May 30, 2025

**ZVMLAW PLLC**

By: __*/s/ Zachary V. Moen*_____

Zachary V. Moen (IL Bar No. 6280643)
Daniel A. Grossman
777 E. Eisenhower Pkwy, Suite 910
Ann Arbor, MI  48108
(734) 794-3070
zak@zvmlaw.com
danny@zvmlaw.com

150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(312) 291-4499

*Attorneys For Plaintiffs*